**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| KI METAL CO., LTD. and HUN SIK CHOI, <br><br> Plaintiffs, <br><br> v. <br><br> CAPRI HOLDINGS LIMITED, MICHAEL KORS (USA), INC., MICHAEL KORS RETAIL, INC., MICHAEL KORS STORES, L.L.C. and MICHAEL KORS, L.L.C., <br><br> Defendants. | Civil Action No.:   6:22-cv-411-ADA <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs KI Metal Co., Ltd. ("KI Metal") and Hun Sik Choi ("Mr. Choi") (collectively, "Plaintiffs"), through their attorneys, for their Complaint against Capri Holdings Limited, Michael Kors (USA), Inc., Michael Kors Retail, Inc., Michael Kors Stores, L.L.C. and Michael Kors, L.L.C. (collectively, "Michael Kors" or "Defendants"), demand a trial by jury and allege as follows:

**INTRODUCTION**

1.       Michael Kors is a global fashion luxury brand that designs, manufactures, and sells designer apparel and accessories. Michael Kors is best known for its luxury bags and handbags, which often bear a heavy dose of metallic design elements in addition to its ubiquitous "MK" logo. Michael Kors distributes and sells these products through branded retail locations and online stores, as well as department stores, specialty stores, and licensing partners throughout the United States.

## NATURE OF THE ACTION

2.      This is an action for infringement of U.S. Patent No. 9,894,963 ("the '963 Patent") and U.S. Patent No. 10,575,598 ("the '598 Patent") (collectively, the "Patents-in-Suit").

## THE PARTIES

3.      KI Metal Co., Ltd. is a limited liability company organized under the laws of Korea, with a principal place of business at 12243, 670-3 Ilpae-dong, Namyangju-si, Gyeonggi-do, Korea. KI Metal is a co-owner of the Patents-in-Suit.

4.      Hun Sik Choi is an individual residing in Korea whose principal residence is in Namyangju-si, Gyeonggi-do, Korea.  Mr. Choi is the Vice President of KI Metal and the inventor and a co-owner of the Patents-in-Suit.

5.      Capri Holdings Limited is a publicly held company organized under the laws of the British Virgin Islands, with a principal place of business at 33 Kingsway, London, United Kingdom, WC2B 6UF, and may be served pursuant to the provisions of the Hague Convention. Capri Holdings Limited is the parent company of co-defendants Michael Kors (USA), Inc., Michael Kors Retail, Inc., Michael Kors Stores, L.L.C. and Michael Kors, L.L.C. (collectively, "Defendants").

6.      Capri Holdings Limited, directly or through its subsidiaries, operates Michael Kors retail locations around the world, including in this District.  Capri Holdings Limited sells Michael Kors-branded products, including those products accused of infringement (the "Accused Products," as defined below), through retail and wholesale distribution channels around the world, including in this District.  Capri Holdings Limited also operates an online store through which it sells Michael Kors-branded products, including the Accused Products, including within this District.

7.      Michael Kors (USA), Inc. is a corporation organized under the laws of Delaware with its principal place of business at 11 West 42nd Street, New York, NY 10036.  Michael Kors (USA), Inc. is a subsidiary of Capri Holdings Limited.  Michael Kors (USA), Inc. is involved with the sales and distribution of Michael Kors-branded products, including the Accused Products, in the United States, including at Michael Kors retail locations located in this District.

8.      Michael Kors Retail, Inc. is a corporation organized under the laws of Delaware, with its principal place of business at 11 West 42nd Street, New York, NY 10036.  Michael Kors Retail, Inc. is a subsidiary of Capri Holdings Limited.  Michael Kors Retail, Inc. is involved with the sales and distribution of Michael Kors-branded products, including the Accused Products, in the United States, including at Michael Kors retail locations located in this District.

9.      Michael Kors Stores, L.L.C. is a limited liability company organized under the laws of New York, with its principal place of business at 11 West 42nd Street, New York, NY 10036. Michael Kors Stores, L.L.C. is a subsidiary of Capri Holdings Limited. Michael Kors Stores, L.L.C. is involved with the sales and distribution of Michael Kors-branded products, including the Accused Products, in the United States, including at Michael Kors retail locations located in this District.

10.     Michael Kors, L.L.C. is a limited liability company organized under the laws of Delaware, with its principal place of business at 11 West 42nd Street, New York, NY 10036. Michael Kors, L.L.C. is a subsidiary of Capri Holdings Limited.  Michael Kors, L.L.C. operates Michael Kors retail locations throughout the world, including within this District.  Michael Kors, L.L.C. is involved with the manufacture and distribution of Michael Kors-branded products, including the Accused Products, throughout the world, including within this District.

11.     Joinder is proper under 35 U.S.C. § 299.  The allegations of infringement contained herein are asserted against the Defendants jointly, severally, or in the alternative and arise, at least in part, out of the same series of transactions or occurrences relating to Defendants' manufacture, use, sale, offer for sale, and importation of the same Accused Products.  Defendants are part of the same corporate family of companies, and the infringement allegations arise at least in part from Defendants' collective activities with respect to the Accused Products.  Questions of fact common to Defendants will arise in the action, including questions relating to Defendants' infringing acts.

## JURISDICTION AND VENUE

12.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13.     Defendants are subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, due at least to their substantial business in this forum, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods provided to individuals in Texas and in this District.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391(c) and 1400(b).

15.     Defendants have transacted business in this District and have committed acts of patent infringement in this District.  Additionally, Defendants maintain a substantial physical presence in Texas and within this District.

16.     Defendants regularly solicit and conduct business in Texas.  Specifically, Defendants advertise, offer for sale, and sell Michael Kors-branded goods, including the Accused Products, within Texas.  Defendants employ individuals and operate retail stores throughout Texas, including

stores within this District in El Paso, Canutillo, Austin, Round Rock, San Marcos, and San Antonio, where the Accused Products are advertised, offered for sale and sold.

17.     In addition, Defendants offer for sale, sell, and distribute Michael Kors-branded goods, including the Accused Products, to wholesale customers (e.g., Macy's, Saks Fifth Avenue, and Bloomingdales) that in turn sell the goods, including the Accused Products, in their stores throughout Texas, including stores within this District.  Defendants' wholesale customers also own and operate online stores through which they sell Michael Kors-branded goods, including the Accused Products, in Texas and within this District.

18.     Defendants also own and operate an online store through which they sell substantial volumes of goods, including the Accused Products, in Texas and within this District.  Through their online stores and through their retail stores and wholesale customers, Defendants have directly and indirectly extracted significant revenues from Texas and this District.

19.     Defendants have committed tortious acts within Texas and this District, and the causes of action set forth in this Complaint arise from those acts.  Defendants develop, manufacture, distribute, advertise, offer for sale, and sell (through their online stores and through their retail stores and wholesale customers) the Accused Products within Texas and this District, which are, and have been, purchased and used by customers in Texas and within this District.  Defendants, through their online stores and through their retail stores and wholesale customers, also place the Accused Products within the stream of commerce, with the knowledge and/or understanding that such Accused Products will be offered for sale, sold, and/or used in Texas and in this District.

## FACTUAL ALLEGATIONS

### KI Metal

20.     KI Metal is a family-owned and operated company based in Korea that designs and manufactures high quality metal goods, including for clients in the fashion industry. These products include, but are not limited to, hooks, rings, buckles, clasps, eyelets, chains, labels, logos, and more.



21.     Founded in 1980, KI Metal has grown from a small family-run operation to a large and sophisticated supplier with a 35,000 square foot manufacturing facility, including a complete range of design and manufacturing equipment, and as many as one hundred employees. KI Metal designs, manufactures, and exports high-quality products to customers throughout the world.

22.     KI Metal began supplying high-fashion brands in 1986 through Pacific Buying & Marketing Service (PBMS), one of Korea's most established companies specializing in sourcing fabrics, apparel, and accessories for fashion brands.  In 2005, KI Metal expanded into accessories for bags and handbags.  Thereafter, KI Metal's prominence grew throughout industry.  By 2014, it was supplying prominent fashion brands such as Louis Quatorze, LF Fashion, and Cheil Industries.

**New And Improved Eyelets**

23.     Mr. Choi is the son of KI Metal's founder, and joined the family business twenty

years ago.  He currently serves as KI Metal's Vice-President and manages the day-to-day business.

He also serves as KI Metal's lead designer, designing new products to meet needs in the market.

24.     In 2013, Mr. Choi invented a new and improved eyelet for its customers in the

fashion industries.  At that time, there were two commonly used eyelet designs, each of which had

significant drawbacks. The first was a "rivet" design.  This design required inserting a protruding

portion of the eyelet through a hole in the fabric and then physically folding (or deforming) the

inserted portion back over the fabric (or second piece of the eyelet) and/or crimping the portion to

hold it in place. This design, however, led to unsightly, rough edges and unclean lines. It was also

difficult to install and prone to errors because of the physical deformation required during

installation. These errors, in turn, led to increased manufacturing costs, as finished products (bags)

had to be discarded if the eyelets did not install correctly.  Customer returns were also common, for

example, because the edges of the eyelet would catch on material and cause damage over time.

  

25.     The second design commonly used at that time was a "screw" design, comprised of

two pieces of the eyelet held together by two small screws.  This design was difficult and time

consuming to install because the screws needed to be individually screwed in by hand, and it was

unsightly because the screws were located on the outside of the eyelet and visible to the consumer.

In addition, with use, the pieces would move and rotate, causing the screws to loosen over time.

 

26.     Mr. Choi's new and improved eyelet design consists of two symmetrical pieces that are combined using a novel locking mechanism that is activated by pressing the pieces together. The design solved the deficiencies of the prior art for several reasons.  First, the design is aesthetically appealing; when the pieces are combined together, the locking mechanism is not visible from the outside, so the eyelets are smooth and identical on both sides. This improves the visual appeal of the eyelet and, as a result, the product in which it is installed. Second, the design has better performance and increased consumer satisfaction because it has a smooth surface without edges that could catch on the bag or the clothing of the consumer. Third, the design is durable and does not come apart or move around—which would cause damage to the bag over time—because the locking mechanism holds the pieces firmly together.  Finally, the eyelets are easily installed by merely pressing the pieces together, thus resulting in fewer manufacturing defects.

  

**The Eyelet Patents**

27.     Mr. Choi's inventions were novel and unique. That novelty would be recognized by patent offices around the world, including in Korea, the European Union, United States, and China.

To date, Mr. Choi and/or KI Metal have been awarded more than 15 patents related to the eyelets. These issued patents include but are not limited to the following presently relevant to this litigation.

28.     On January 29, 2015, the Korean Intellectual Property Office issued KR Patent No. 10-1490087 ("the KR'087 Patent"), entitled "Ornament Assembly." The KR'087 Patent stems from Korean Patent Application No. 10-2014-0150510, filed on October 31, 2014, and claims priority to Korean Patent Application No. 10-2014-0107284, filed on August 18, 2014.

29.     On November 27, 2015, the Korean Intellectual Property Office issued KR Patent No. 10-1574461 ("the KR'461 Patent"), entitled "Ornament Assembly." The KR'461 Patent stems from Korean Patent Application No. 10-2015-0005330, filed on January 13, 2015, and is a divisional of Korean Patent Application No. 10-2014-0150510 (above), filed on October 31, 2014.

30.     On February 25, 2016, the World Intellectual Property Organization published PCT Application No. WO 2016/027944 ("the PCT Publication"), entitled "Accessory Assembly." The PCT Publication stems from Application No. PCT/KR2014/013111, filed on December 31, 2014, and claims priority to the Korean applications that led to the KR'087 and KR'461 Patents.

31.     On September 8, 2016, the United States Patent and Trademark Office published U.S. Patent Application Publication No. US 2016/0255917 ("the US'917 Publication"), entitled "Ornament Assembly." The US'917 Publication stems from International PCT Application No. PCT/KR2014/013111, filed on December 31, 2014 as U.S. Patent Application No. 14/425,577, and claims priority to the Korean applications that led to the KR'087 and KR'461 Patents.

32.     On February 20, 2018, the United States Patent and Trademark Office issued U.S. Patent No. 9,894,963 ("the '963 Patent"), entitled "Ornament Assembly." The '963 Patent also stems from International PCT Application No. PCT/KR2014/013111, filed on December 31, 2014 as U.S. Patent Application No. 14/425,577, and claims priority to the Korean applications that led

to the KR'087 and KR'461 Patents. The inventions as claimed in the '963 Patent are substantially identical to the inventions as claimed in the PCT Publication and in the US'917 Publication.   A true and correct copy of the '963 Patent is attached as **Exhibit 1**.

33.     On March 3, 2020, the United States Patent and Trademark Office issued U.S. Patent No. 10,575,598 ("the '598 Patent"), entitled "Ornament Assembly." The '598 Patent stems from U.S. Patent Application No. 15/864,325 and is a continuation of the '963 Patent, and thus claims priority to the Korean applications that led to the KR'087 and KR'461 Patents. A true and correct copy of the '598 Patent is attached as **Exhibit 2**.

34.     On September 28, 2021, the United States Patent and Trademark Office issued U.S. Patent No. 11,129,451 ("the '451 Patent"), entitled "Ornament Assembly." The '451 Patent stems from U.S. Patent Application No. 16/683,437 and is a continuation of the '963 and '598 Patents, and thus claims priority to the Korean applications that led to the KR'087 and KR'461 Patents.

35.     The '963 and '598 Patents describe and claim variations on a novel eyelet design consisting of two bodies combined together using a unique locking mechanism and configuration that ensures that both sides appear identical in appearance (*i.e.*, no seam, rivet, or screw visible). The locking mechanism ensures that the two bodies do not rotate or disengage with one another when in use. They are also easy to install and can be made in many different shapes and sizes.

  

Figure 1. '963, Fig. 1     Figure 2. '963, Fig. 9     Figure 3. '963, Fig. 13

 

Figure 4. '963, Fig. 2                    Figure 5. '963, Fig. 3

36.    Mr. Choi is the named inventor of the '963 and '598 Patents. As of the filing of this

Complaint, Mr. Choi and KI Metal are co-assignees and co-owners of the '963 and '598 Patents.

## Michael Kors

37.    Michael Kors is a global fashion luxury brand recently subsumed into Capri

Holdings Limited and comprised of the Defendants in this action (heretofore, "Michael Kors"),

which designs, manufactures, and sells designer apparel and accessories, including handbags.

Michael Kors generates the bulk of its revenue, as much as 70 percent, from the sale of handbags.

38.    Michael Kors claims to design its products in the United States, but admits that the

majority of its products are manufactured in Asia.  In particular, Michael Kors contracts for the

purchase of finished goods principally with third-party manufacturing contractors.  Michael Kors

also has various agents who source finished goods with manufacturing contractors on its behalf.

39.    Michael Kors directs and controls the manufacture of its products. Capri's FY 2021

Annual Report stated that "[t]he manufacturing contractors and agents for our brands operate under

the close supervision of our global manufacturing divisions and buying agents located in North

America, Europe and Asia. ***All products are produced according to our specifications***."[1]  In addition, Michael Kors employees and agents are physically present at these manufacturing facilities. Indeed, Capri's FY 2021 Annual Report stated that its "production staff monitors manufacturing at supplier facilities in order to correct problems prior to shipment of the final product."

40.     Michael Kors distributes and sells its products through company-operated retail locations and online stores, department stores, specialty stores, and licensing partners.  Michael Kors' distribution network has a presence in over 100 countries, with the United States making up one of the company's most significant markets.  For example, for the 2020-2021 fiscal year, over 60 percent of Michael Kors' revenue came from the United States, Canada, and Latin America.

### Michael Kors Buys the Patented Eyelets from KI Metal

41.     In or around 2013, Michael Kors began purchasing metal hardware from KI Metal for incorporation into its handbags and other products. The metal hardware consisted of emblems, buckles, clasps, chains, and other items, that Michael Kors' contract manufacturers in Korea and China would then incorporate into finished good products they manufactured for Michael Kors.



---

[1] Capri Holdings Ltd. 2021 Annual Report at 13, *available at* http://www.capriholdings.com/financials/annual-reports/ (emphasis added).

42.     In or around 2015, Michael Kors began to purchase the patented eyelets from KI Metal and incorporate them into its products. These eyelets were a major improvement over the previous eyelets used by Michael Kors, which suffered from various deficiencies of the prior art.

  

43.     From March 2015 to November 2017, Michael Kors, through its manufacturing contractors, purchased millions of dollars' worth of eyelets from KI Metal.  With the new eyelets, manufacturing defects were almost entirely eliminated, and customer returns dropped significantly.

44.     Michael Kors knew the KI Metal eyelets were protected by patents, including in Korea and the United States. KI Metal provided actual and constructive notice to Michael Kors of the '963 and '598 Patents, including pursuant to 35 U.S.C. § 287, and its infringement allegations.

45.     For example, KI Metal shared with Michael Kors and its agents a catalogue titled "PATENT EYELET COLLECTION OF KI METAL."  The catalogue included physical samples of the patented eyelets, the Certificates of Patent for the KR'087 Patent and KR'461 Patent, and records of the pending '963 Patent application and PCT patent application.



Michael Kors and its agents received and reviewed this presentation, and approved purchases from KI Metal with full knowledge of KI Metal's patent protection. These executives included, but are not limited to, Nathan Serphos, Senior Vice President of Accessories and Footwear Development, Production, and Sourcing at Michael Kors (https://www.linkedin.com/in/nathan-serphos-38a7886).

46.     In addition, KI Metal provided to Michael Kors and its agents a company profile of KI Metal. KI Metal provided this company profile at Michael Kors' request. This company profile included details about KI Metal's history, capabilities, and product offerings. This company profile also included the Certificates of Patent for the KR'087 Patent and KR'461 Patent, and records of the pending '963 Patent application and PCT patent application.




Michael Kors and its agents received and reviewed this presentation, and approved purchases from KI Metal with full knowledge of KI Metal's patent protection. These executives included, but are not limited to, Nathan Serphos, Senior Vice President of Accessories and Footwear Development, Production, and Sourcing at Michael Kors (https://www.linkedin.com/in/nathan-serphos-38a7886).

47.      KI Metal also marked the patented eyelets it sold to Michael Kors in accordance with 35 U.S.C. § 287. KI Metal specifically stamped the eyelets with the words "KI" and "Patent."

 

If one considers the number of patented eyelets Michael Kors purchased from KI Metal, including the samples delivered to Michael Kors' designers and executives in New York on many occasions at its request, Michael Kors and its agents observed this "PATENT" marking thousands of times.

48.      KI Metal also identified the patented eyelets with the word "Patent" in the ordering system used by Michael Kors and its agents, including in the material codes used by such systems.



If one considers the number of orders of patented eyelets that Michael Kors and its agents made

from KI Metal, Michael Kors and its agents observed this "PATENT" marking hundreds of times.

49.     KI Metal's website, in both Korean and English, also provided Michael Kors and its

agents information about its patents. For example, KI Metal's website included a banner and section

on its homepage that highlighted its patented eyelets and included information on its eyelet patents.



KI Metal's website also included a specific top-level page, titled "Patent," which was displayed in

the main (top-level) navigation of every page of the website. This "Patent" page included details

about the patents and patent applications, including in the United States, applicable to its eyelets.



On information and belief, and as will be shown in discovery, Michael Kors, its executives, and its agents were aware of KI Metal's website, reviewed the information posted thereon regarding the patents and patent applications applicable to the eyelets and tracked those patents and applications.

### Michael Kors' Counterfeit Eyelets

50.     In or around late 2017, Michael Kors and its agents engaged a Chinese supplier called Hung Hing Metal Manufacturing Limited a/k/a Hongxing Hardware Manufacture Factory Limited Company ("Hung Hing Metal") to create counterfeit versions of KI Metal's patented eyelets.

51.     Michael Kors and its agents then purchased and incorporated those counterfeit versions of KI Metal's eyelets into Michael Kors' handbags and other products for distribution and sale around the world, including throughout the United States and this District. Simultaneously, and as a result, Michael Kors and its agents began purchasing fewer and fewer patented eyelets from KI Metal, until finally ceasing purchases of KI Metal's patented eyelets altogether by the end of 2017.

52.     Indeed, after purchasing approximately more than 2 million of KI Metal's patented eyelets in 2015, 4 million of KI Metal's patented eyelets in 2016, and more than 2.5 million of KI

Metal's patented eyelets in 2017, Michael Kors and its agents purchased zero of KI Metal's patented eyelets in 2018.[2] And yet Michael Kors continued to sell handbags and other products with similar eyelets for distribution and sale around the world, including throughout the United States.

53.     On information and belief, Michael Kors and its agents hired Hung Hing Metal to create counterfeit versions of the patented eyelets, and installed the counterfeit eyelets into finished handbags and other products, even though Michael Kors had knowledge and notice of the issued patents, pending patent applications, and published patent applications that protected the eyelets, and knew that its copying of the eyelets would infringe on KI Metal's intellectual property rights.

## MICHAEL KORS' SUPPLY CHAIN

54.      Indeed, Michael Kors instructed its contract manufacturing agents in Korea, China, Vietnam, and other locations in Asia to purchase and install the counterfeit eyelets in its handbags.

55.     As noted above, Michael Kors claims to design its products in the United States, but the majority of its products are manufactured in Asia.  In particular, Michael Kors contracts for the purchase of finished goods with select third-party manufacturing contractors or agents—"nearly all" of whom are in Asia. *See e.g.*, Capri Holdings' FY 2021 Annual Report, at 13 ("Nearly all of our Michael Kors products were produced in Asia in Fiscal 2021."). These are long-standing, close relationships. Indeed, Michael Kors' largest manufacturing contractor, who produces its products in Asia and who Michael Kors has worked with for about 20 years, accounted for the production of approximately 18% of its finished products, based on dollar volume in Fiscal 2021. *Id.* at 13.

56.     Michael Kors' manufacturing contractors supply all of Michael Kors' products, including the handbags at issue in this litigation, to customers throughout the world, whether that be

---

[2] Michael Kors and its agents continued to purchase other products from KI Metal throughout 2018, but ceased all purchases completely after KI Metal raised concerns about Michael Kors and its agents' use of counterfeit eyelets and infringement of KI Metal's intellectual property rights.

through company-operated retail locations and online stores, department stores, or specialty stores. This includes but is not limited to customers in this District through each of those instrumentalities. This also includes the export of Michael Kors products, including the Accused Products, by those manufacturing contractors and the import of those Michael Kors products into the United States.

57.     Michael Kors directs and controls this entire supply chain, including the import of its products for sale in the United States and this District. Indeed, Capri's FY 2021 Annual Report stated that "[t]he manufacturing contractors and agents for our brands operate under the close supervision of our global manufacturing divisions and buying agents located in North America, Europe and Asia. ***All products are produced according to our specifications***."[3]  Michael Kors employees and agents are also physically present at these manufacturing facilities. Indeed, Capri's FY 2021 Annual Report stated that its "production staff monitors manufacturing at supplier facilities in order to correct problems prior to shipment of the final product."  In short, Michael Kors directs and controls each and every link in its supply chain, including each link involved in the present litigation.

58.     Consistent therewith, Michael Kors directed its manufacturing contractors and agents to source the counterfeit eyelets from Hung Hing Metal, and then to install those counterfeit eyelets in Michael Kors handbags and other products for importation and sale in the United States, with knowledge that those infringing products would be sold in the United States and this District.

### Michael Kors' Infringing Products

59.     Michael Kors began making, using, selling, and/or offering to sell in the United States, and/or importing into the United States, handbags and other products that incorporate the

---

[3] Capri Holdings Ltd. 2021 Annual Report at 13, *available at* http://www.capriholdings.com/financials/annual-reports/ (emphasis added).

counterfeit eyelets (the "Accused Products") at least as early as 2018.  The Accused Products include but are not limited to handbags in the Greenwich, Raven, and Brooklyn product "groups," and include but are not limited to the following and their equivalents: Greenwich Bucket Bag, Frankie Drawstring Shoulder Tote, Camden Drawstring Shoulder Tote, Raven Shoulder Bag, Brooklyn Satchel, Brooklyn Saddle Bag, Suri Crossbody Bag, and Fulton Shoulder Bag. Exemplary photos of certain of the Accused Products are provided below. However, this is just a subset of the scope of Accused Products. Additional infringing products will be revealed in discovery.


Greenwich Bucket Bag


Greenwich Bucket Bag


Frankie Drawstring Shoulder Tote


Frankie Drawstring Shoulder Tote


Alanis Bucket Bag


Alanis Leather Bucket Bag


Camden Drawstring Shoulder Tote


Camden Drawstring Shoulder Tote


Raven Logo Shoulder Bag


Raven Leather Shoulder Bag


Brooklyn Large Leather Satchel


Brooklyn Small Logo Satchel


Brooklyn Saddle Bag


Brooklyn Saddle Bag


Suri Logo Crossbody Bag


Suri Leather Crossbody Bag


Fulton Logo Shoulder Bag


Fulton Shoulder Bag

60.     The Accused Products practice one or more claims of the '963 and '598 Patents.

61.     In or around early 2018, KI Metal purchased a Michael Kors Brooklyn Satchel handbag after noticing that the eyelets looked familiar. A closer examination of the Michael Kors handbag made clear that the eyelets installed therein were copies of KI Metal's patented eyelets. Indeed, the primary difference is that the markings "KI" and "PATENT" are missing. *See e.g.*,

| KI Metal Patented Eyelet | Michael Kors' Counterfeit Eyelet |
|---|---|
|  |  |
|  | <br>* Note: locking portion shorn off during separation |
|  |  |



| KI Metal Patented Eyelet | Michael Kors' Counterfeit Eyelet |
|---|---|

62.     Since KI Metal's patented eyelets reflected, embodied, and practiced Plaintiffs'

patents, it is not surprising that Michael Kors' counterfeit products likewise infringed those patents.

| '963 Patent | Michael Kors' Counterfeit Eyelet |
|---|---|
| | |
| | * Note: locking portion shorn off during separation |

| '963 Patent | Michael Kors' Counterfeit Eyelet |
|:---:|:---:|
|  | |

## Michael Kors Attempts to Bully KI Metal

63.     After KI Metal became aware of Michael Kors' counterfeit activity and deliberate patent infringement, KI Metal provided notice thereof to Michael Kors' executives in New York in a manner that satisfies 35 U.S.C. § 287.  Specifically, on April 11, 2018, KI Metal sent a letter to Michael Kors notifying Michael Kors of its infringement of, among other patents, the '963 Patent.

64.     Erica J. Weiner, Assistant General Counsel for Global IP & Brand Protection for Michael Kors, responded on June 7, 2018. Ms. Weiner's response, which Ms. Weiner designated as a "Federal Rule of Evidence 408 Settlement Communication," demonstrated that Michael Kors had an objective understanding that it was accused of infringing, among other patents, the '963 Patent.

65.     Michael Kors' response to KI Metal was also rude, condescending, and dismissive. It was a surprising tact to take for a company that is such a visible and vocal advocate for its own intellectual property rights. Nor was it a fluke. Michael Kors would proceed to try to demean and bully KI Metal throughout the discussions that would follow through and including an in-person meeting at KI Metal's offices in October 2018 attended by Nathan Serphos, Senior Vice President of Accessories and Footwear Development, Production, and Sourcing at Michael Kors. Throughout that engagement, Michael Kors demonstrated an utter disregard for the intense and sustained injury Kors' deliberate actions had on KI Metal's business and the value of its intellectual property rights.

66.     Despite having an objective understanding that it was accused of infringing, among other patents, the '963 Patent, Michael Kors continued to make, use, sell, offer to sell, and/or import the Accused Products, including in the United States, after receiving KI Metal's April 11, 2018 letter and at least through the in-person meeting in October 2018 and through the 2019 season. On information and belief, Michael Kors continues to sell those same products in the United States.

**FIRST COUNT**

**(INFRINGEMENT OF U.S. PATENT NO. 9,894,963)**

67.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-66 as though fully set forth herein.

68.     Michael Kors has infringed and continues to infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '963 Patent by making, using, selling, and/or offering to sell in the United States, and/or importing into the United States, products, including but not limited to the Accused Products, without permission. Michael Kors is thus liable for direct infringement of the '963 Patent pursuant to 35 U.S.C. § 271(a).

69.     Michael Kors had knowledge of the '963 Patent prior to, or at least as of, the filing of this Complaint and had knowledge that the products identified herein infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '963 Patent. Michael Kors has induced and encouraged the direct infringement of the '963 Patent by Michael Kors' wholesalers, distributors, retailers, department stores, specialty stores, repair shops, and licensing partners by intentionally directing them and encouraging them to make, use, sell, and/or offer to sell within the United States and/or to import into the United States one or more products that embody the patented invention. Michael Kors provided marketing material, product documentation, and customer support to instruct its partners on how to sell and repair the infringing products. Michael Kors is therefore liable for indirect infringement of the '963 Patent pursuant to 35 U.S.C. § 271(b).

70.     Michael Kors had knowledge of the '963 Patent prior to, or at least as of, the filing of this Complaint and had knowledge that the products identified infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '963 Patent. Michael Kors has and continues to contributorily infringe, and will continue to contributorily infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '963 Patent. Michael Kors has contributorily infringed the '963 Patent by offering to sell, selling, and/or importing into the United States a component constituting a material part of the invention disclosed in at least claim 1 in the '963 Patent, knowing the same to be made or adapted specially for use in the infringement of at least claim 1 of the '963 Patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use. Michael Kors is therefore liable for indirect infringement of the '963 Patent pursuant to 35 U.S.C. § 271(c).

71.     Michael Kors' infringement has been knowing and willful. On information and belief, Michael Kors had actual knowledge of its infringement of the '963 Patent and/or it had knowledge of its infringement by way of willful blindness prior to the filing of this Complaint.

72.     Michael Kors had actual knowledge of its infringement of the '963 Patent at least as early as April 2018 when it received a letter from KI Metal informing it of its infringement, indeed earlier as a result of KI Metal's disclosures thereto, yet its infringement continued unabated.

73.     Furthermore, Michael Kors had constructive knowledge of its infringement of the '963 Patent as of the issue date thereof, including because KI Metal gave notice to the public that its eyelets were patented by fixing thereon the word "Patent," labeling them with the word "Patent" in the Michael Kors ordering system, as well as providing a posting on the Internet, accessible to the public without charge, associating the eyelets with the applicable patents and patent applications.

74.     In addition, Michael Kors had knowledge of the '963 Patent by way of willful blindness. Michael Kors learned of the KR'087 Patent, the KR'461 Patent, the PCT Application, and the '963 Application and that KI Metal's eyelets were protected thereby in or around 2015 by way of a product catalog. Michael Kors was further reminded of the KR'087 Patent, the KR'461 Patent, the PCT Application, and the '963 Application and that KI Metal's eyelets were protected thereby, in or around January 2017 when Michael Kors received a company profile for KI Metal that disclosed and emphasized the same. Furthermore, Michael Kors had knowledge of the same because KI Metal printed "Patent" on the eyelets, identified the eyelets with the word "Patent" in the Michael Kors ordering system, and provided a posting on the Internet, accessible to the public without charge, associating the eyelets with the applicable patents and patent applications. On information and belief, Michael Kors had a subjective belief that the '963 Patent would issue from the KR'087 Patent, the KR'461 Patent, the PCT Application, and the '963 Application, yet it chose

to be willfully blind to the progression and issuance of the '963 Patent. After having knowledge that KI Metal's eyelets were protected by the KR'087 Patent, the KR'461 Patent, and that the PCT Application and '963 Patent Application were pending, Michael Kors subjectively believed that there was a high probability that the '963 Application progressed to an issued patent infringed by its products, *i.e.*, the '963 Patent, and furthermore took deliberate actions to avoid learning of this fact.

75.     On information and belief, Michael Kors also had knowledge of its infringement of the '963 Patent by way of willful blindness. Michael Kors had knowledge of the '963 Patent as set forth above, yet it created counterfeit versions of the eyelets and incorporated them into the Accused Products. On information and belief, Michael Kors subjectively believed that there was a high probability that its manufacture, use, sale, and/or offer for sale in the United States, and/or importation into the United States, of the Accused Products infringed the issued '963 Patent.

76.     Michael Kors has had knowledge of the infringing nature of its manufacture, use, sale, and/or offer for sale in the United States, and/or importation into the United States, of the Accused Products, and nevertheless continued, and continues its infringing activities with respect to the '963 Patent.

77.     As Michael Kors' infringement of the '963 Patent has been and continues to be deliberate and willful, this is an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285. Prior to the filing of this Complaint Michael Kors had actual knowledge of the issued '963 Patent and it had knowledge of the patent by way of willful blindness. After acquiring that knowledge Michael Kors infringed the patent, and in doing so it knew, should have known, and/or was willfully blind to the fact, that its conduct amounted to infringement.

78.     As a result of Michael Kors' infringement of the '963 Patent, Plaintiffs have suffered monetary damages, and seek recovery in an amount adequate to compensate for Michael Kors' infringement, but in no event less than a reasonable royalty with interest and costs.

## SECOND COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 10,575,598)

79.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-78 as though fully set forth herein.

80.     Michael Kors has infringed and continues to infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '598 Patent by making, using, selling, and/or offering to sell in the United States, and/or importing into the United States, products, including but not limited to the Accused Products, without permission. Michael Kors is thus liable for direct infringement of the '598 Patent pursuant to 35 U.S.C. § 271(a).

81.     Michael Kors had knowledge of the '598 Patent prior to, or at least as of, the filing of this Complaint and had knowledge that the products identified herein infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '598 Patent. Michael Kors has induced and encouraged the direct infringement of the '598 Patent by Michael Kors' wholesalers, distributors, retailers, department stores, specialty stores, repair shops, and licensing partners by intentionally directing them and encouraging them to make, use, sell, and/or offer to sell within the United States and/or to import into the United States one or more products that embody the patented invention. Michael Kors provided marketing material, product documentation, and customer support to instruct its partners on how to sell and repair the infringing products. Michael Kors is therefore liable for indirect infringement of the '598 Patent pursuant to 35 U.S.C. § 271(b).

82.     Michael Kors had knowledge of the '598 Patent prior to, or at least as of, the filing of this Complaint and had knowledge that the products identified infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '598 Patent. Michael Kors has and continues to contributorily infringe, and will continue to contributorily infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '598 Patent. Michael Kors has contributorily infringed the '598 Patent by offering to sell, selling, and/or importing into the United States a component constituting a material part of the invention disclosed in at least claim 1 in the '598 Patent, knowing the same to be made or adapted specially for use in the infringement of at least claim 1 of the '598 Patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use. Michael Kors is therefore liable for indirect infringement of the '598 Patent pursuant to 35 U.S.C. § 271(c).

83.     Michael Kors' infringement has been knowing and willful. On information and belief, Michael Kors had actual knowledge of its infringement of the '598 Patent and/or it had knowledge of its infringement by way of willful blindness prior to the filing of this Complaint.

84.      Michael Kors had actual knowledge of its infringement of the '598 Patent at least as early as the filing of this Complaint, yet its infringement continued unabated.

85.     On information and belief, Michael Kors also had knowledge of its infringement of the '598 Patent by way of willful blindness. After having knowledge of the '963 Patent application, and deliberately hiring Hung Hing Metal to make a carbon copy of the eyelets for which the '963 Patent application was pending, Michael Kors subjectively believed that there was a high probability that its manufacture, use, sale, and/or offer for sale in the United States, and/or importation into the United States, of the Accused Products would infringe claims of patents issued in this patent family, and took deliberate actions to avoid learning whether additional patents such

as the '598 Patent had issued and/or whether its manufacture, use, sale, and/or offer for sale in the United States, and/or importation into the United States, of the Accused Products infringed the issued claims of the '598 Patent.

86.     Michael Kors has had knowledge of the infringing nature of its manufacture, use, sale, and/or offer for sale in the United States, and/or importation into the United States, of the Accused Products, and nevertheless continued, and continues its infringing activities with respect to the '598 Patent.

87.     As Michael Kors' infringement of the '598 Patent has been and continues to be deliberate and willful, this is an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285. Michael Kors had actual knowledge of the issued '598 Patent at least as early as the filing of this Complaint, and it had knowledge of the patent by way of willful blindness prior to the filing of the Complaint. After acquiring that knowledge Michael Kors infringed the patent, and in doing so, it knew, or should have known, that its conduct amounted to infringement of the patent.

88.     As a result of Michael Kors' infringement of the '598 Patent, Plaintiffs have suffered monetary damages, and seek recovery in an amount adequate to compensate for Michael Kors' infringement, but in no event less than a reasonable royalty with interest and costs.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all claims, defenses, and other issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and seek relief against Defendants as follows:

A.      For judgment that Defendants have infringed and/or continue to infringe, directly and/or indirectly, one or more claims of the Patents-in-Suit;

B.      For a preliminary and permanent injunction against Defendants, their parents, subsidiaries, affiliates, successors, predecessors, assigns, and the officers, directors, agents, and employees of each of the foregoing, customers and/or licensees and those persons acting in concert or participation with any of them enjoining them from infringement of the Patents-in-Suit, including but not limited to an injunction against making, using, selling, and/or offering for sale within the United States, and/or importing into the United States, any products that infringe the Patents-in-Suit;

C.      For judgment awarding Plaintiffs damages adequate to compensate them for the infringement that has occurred, in accordance with 35 U.S.C. § 284, in lost profits, price erosion, and/or reasonable royalty, including prejudgment and post-judgment interest at the highest rates allowed by law;

D.      For judgment awarding pre-issuance damages pursuant to 35 U.S.C. § 154(d);

E.      For judgment imposing a mandatory future royalty payable on each and every product sold by Defendants that is found to infringe the Patents-in-Suit and on all future products which are not colorably different from products found to infringe;

F.      For judgment that Defendants have willfully infringed and continue to willfully infringe one or more claims of the Patents-in-Suit;

G.      For judgment that Defendants have infringed in bad faith and continue to infringe one or more claims of the Patents-in-Suit in bad faith;

H.      For judgment awarding enhanced damages pursuant to 35 U.S.C. § 284;

-32-

I.      For judgment awarding attorneys' fees pursuant to 35 U.S.C. § 285 or

otherwise permitted by law;

J.      For judgment awarding costs and expenses of suit; and

K.      For judgment awarding Plaintiffs such other and further relief as the Court

may deem just and proper.

Dated: April 22, 2022

Respectfully submitted,

*/s/ B. Russell Horton*
Michael Flynn-O'Brien (*Pro Hac Pending*)
California State Bar No. 291301
Hillary Bunsow (*Pro Hac Pending*)
California State Bar No. 278719
Bunsow De Mory LLP
701 El Camino Real
Redwood City, Ca 94063
(650) 351-7241 Telephone
(415) 426-4744 Facsimile
mflynnobrien@bdiplaw.com
hillarybunsow@bdiplaw.com

***Attorney in charge for Plaintiffs***
***KI METAL CO., LTD. and HUN SIK CHOI***

B. Russell Horton
State Bar No. 10014450
George Brothers Kincaid &Horton, L.L.P.
114 West 7th Street, Ste. 1100
Austin, Texas 78701
(512) 495-1400 Telephone
(512) 499-0094 Facsimile
rhorton@gbkh.com

***Attorney for Plaintiffs***
***KI METAL CO., LTD. and HUN SIK CHOI***